This morning, Your Honor, number 210, Bowie, 6 Academy Premier Assurance Co. v. Matthew Peterson et al. v. at least, argument of the attorneys, Mr. Karen Hendrick, argument of the attorneys, Mr. John Scanlon. Mr. Angle, you may proceed. Thank you, Your Honor. If it please this Court and this Council, my name is Karen Kendall, and today I represent Economy, MetLife, Metropolitan, that collection of agencies. This is a contract case, and the contract at issue is an insurance contract. What I would like to do is first discuss the underlying policy and then discuss the excess policy. As this Court may have gathered from the briefing and the large record in this case, the proper outcome for this, the result, has been very hotly disputed. But I think we can all agree on the basic principles that will guide the resolution of this dispute. First of all, this was a grant of summary judgment. This Court reviews de novo. Second, it's a construction of an insurance contract. This Court construes insurance contracts without deference to the trial court. Moreover, in construing a policy of insurance, what the Court does is look at the language of the contract itself to determine the intent of the parties. Here, this Court is presented with a named operator exclusion endorsement. That endorsement stated that this endorsement applies to your current policy, and it will apply to any renewal, replacement, or midterm change in your policy until it is removed by agreement between the insurer and the insured. It further stated that the provisions of this endorsement supersede and exclude from the policy any contrary provisions. If the exclusion endorsement did not take effect at the time it was signed, it would have said something different, such as, this endorsement will apply to your renewal policy or your replacement policy, or it will take effect six months from the date of signature. Are we limited to the four corners of the documents? Your Honor, the basic principle that Illinois courts have generally followed is that unless you find an ambiguity in the words, that extrinsic evidence is not necessary to tell you what the document was intended to mean. If we look at those words, we don't find anything at all about a renewal or March 15, anything to call into question this endorsement applies to your current policy, I would submit to the Court that that language is clear and unambiguous. The endorsement also stated that the named insured and the excluded person accept this endorsement as witnessed by their signatures. And further, as these endorsements are, it was comprehensive. It applied to any vehicle, any accident, and any person. There was simply no coverage when the excluded driver, in this case, Matthew Peterson, was the driver. There was just absolutely no coverage when that was the case. Now, this isn't the first case. The presumption was unambiguous. I'm sorry. If we make an assumption that the insurance policy was unambiguous, does an agent have the right to change that policy? Not the terms of the policy. The policy itself spells out how you can change the terms. And that can be done by the insurance company itself. And I believe the section under the policy was 10. And it had to be changed by endorsement. And that's exactly the procedure that was followed in this case. And although there are a lot of cases in Illinois that have addressed these exclusion endorsements, there are two that I think are worth looking at in terms of the inquiry before this Court here. One is a 1993 Illinois Supreme Court decision in Dungey v. Haynes. That had a named driver exclusion endorsement. And the excluded driver in that case was the husband. There the Court said, we don't find this policy, this endorsement to be ambiguous, pointing out that the endorsement to be ambiguous must be subject to more than one reasonable interpretation. Now, what was interesting in the Dungey case was the insured person, the wife, said, well, look, I signed a named operator exclusion endorsement at the onset of the policy. I signed it at the renewal. But then subsequently, after it was renewed again, no one asked me to ever sign it after that. And so, therefore, I just assumed that there wasn't any exclusion endorsement in effect. The appellate court, Fifth District, found in favor of the wife and said, look, these factual circumstances create a question of fact and create an ambiguity. The Supreme Court reversed the appellate court's ruling and said the clear and unambiguous language of the policy rebuts any attempt to show ambiguity in the policy itself by reference to factual circumstances. So what the court was doing in Dungey was rejecting the attempt that's made here to say, let's look outside the language of the policy. And the interesting thing in Dungey was it was true that she wasn't asked to sign, repeatedly sign, those exclusion endorsements. But what the declaration sheet in the renewal policy said was it referenced the endorsement number without attaching it or without spelling it out. And the Supreme Court said that's sufficient. That became a part of the policy. The other case I'd like to discuss just briefly is St. Paul Fire and Marine v. Smith, and that's a First District case from 2003. In that case, the appellate court reversed the trial court and ruled in favor of upholding the name driver exclusion. And what was at issue there ultimately was a public policy question because the appellate court said, well, we uphold these provisions unless they're contrary to public policy. That case had very similar facts to the instant case. On January 2, 1996, William Smith was added as a cover driver on his parents' policy. The policy was with St. Paul. St. Paul got William's driver's records just about ten days later, and on January 22, required William's parents to sign a name operator exclusion endorsement, barring William from coverage under the policy. Why? Because he'd had DUIs and a revoked license, and we know the reasons why insurance companies ask someone to sign them. So they did. Well, a few months later, on June 3, William was involved in an accident driving his parents' car. It was a horrible accident. There were three deaths, a $5 million verdict. Prior to that time, William had obtained his own insurance from Valor, and St. Paul filed a declaratory judgment saying, look, we don't have any liability here because of this name operator exclusion endorsement. The response from the people who were contending, the opposite, the defendants in that situation said, one, a name operator exclusion endorsement violates public policy, and number two, it's ambiguous. As I said, the appellate court in that case reversed the judgment in favor of Valor and said there are sound public policy reasons for upholding name driver exclusion endorsements. One, as in this case, it allows a safe driver like Mr. Peterson to continue on his policy. Otherwise, families that have a bad driver in the family will not be able to get insurance. Number two, it's a motivation or incentive for the safe drivers not to allow the unsafe excluded driver to use the vehicle. Those cases are typical of how the Illinois Appellate Court and Supreme Court approaches the construction of insurance contracts. And we're asking this court to use that approach with this name driver exclusion endorsement. Here, there isn't any contention at all that the wrong procedure was used. I submit there's no reasonable contention that there's ambiguity in the language of the name operator exclusion endorsement. If there's no ambiguity, why was it necessary to send an investigator out to talk to Richard and Matthew regarding the exclusion and take statements? I think that's what, that's kind of what communists do. That's what you do, just in case? My guess is, Your Honor, my guess is that no one was contacted, that there weren't any lawyers contacted when that was done. Regarding your reliance on Richard and Matthew's statements, why are only six of the 45 pages of the transcript in the record? I don't know the answer to that, Your Honor. I wondered that myself. I mean, if you cite a transcript, isn't it your obligation to furnish the entire transcript? I believe, Your Honor, you mean in the trial court? Yes. Procedurally, that's what I recommend our trial attorneys do. But I will tell you, you know, in doing appeals, a lot of times you see this desire to hit the relevant pages and not put the other ones in. And this record is 11 volumes, so. Assuming that we look outside the four corners of the document, how do we resolve this if we find there is an ambiguity? Do we send it back or do we just enter a summary, enter affirm? Do we vacate and remand or do we simply construe the ambiguity in favor of the insurer? If you find there's an ambiguity, if you find there's an ambiguity and you find that it's necessary to look outside the language of the contract itself, then you would determine whether there's any dispute of material fact. If there is a dispute of material fact, then it must be remanded. And our second position, our first position is that really this language is clear and non-ambiguous. But our second position is the trial court took it upon himself, and I know we're not reviewing the trial judge's ruling here because it's the noble review, but the trial judge took it upon himself to resolve disputed issues of fact. If those were material, certainly that wouldn't mean that there needs to be a remand. On the issue of whether or not there's an ambiguity, couldn't this be looked at as the absence of an effective date in the endorsement itself was the ambiguity? Well, I'm sure that's the argument our opponents seek to make. On the other hand, if I sign something that says this applies to your current policy, I have a current policy, and it certainly would apply at that time. I sign and date it, and it says this applies to your current policy and excludes all other contrary terms. As in the St. Paul case, when that exclusion endorsement took effect, it was when the – and I'm not misrepresenting to the court that the court decided that issue. No one raised it in that case. It was – there was a public policy issue there. But the policy went into effect at the beginning of January. Twenty days later, the exclusion endorsement went into effect, and less than six months later, the accident occurred. What about the conversation with Mr. Lick, one of your agents, alleged agents, that the policy would continue in force until March 15th? Your Honor, Janet Light has – And another of your claim adjusters, who is closer to the obvious clinician of the company, concurred on that date. I think if you look at the deposition and testimony in the statement, you can find each witness saying both things. I mean, Janet Light said repeatedly and clearly, and we quoted her, that she didn't have the authority to make those decisions, and she didn't make any promises about that. Did the exclusion apply to both the auto policy and to the umbrella? That was why I wanted to separate those, Your Honor, because no, it did not. And Metropolitan wrote the excess policy, and Matthew was covered under that as a household driver. So in order to find that he – that there was no coverage in effect, he was not an – he was not a household driver at the time. And what we pointed out to the court was that there was no intent for him to reside in Richard's household. Richard testified that he was not residing in the household. Janet Light testified that he was not. Let me find out your time is up so you can finish this one. Oh, yes, Your Honor. And so the language of the policy itself requires – it's a current, present tense, residing in the household. Since Matthew was not, that excess policy does not apply to him. Thank you. May it please the Court, I'm John Scanlon, and as noted, I'm the attorney for Molly Brown and Mary Ellen Brown and Franklin Morgan. I've also been asked today to present the positions of the Petersons. They joined in my brief, and they asked that I voice their argument as well. Standard of review is de novo. However, on the point of what should happen in the event that you find in our favor here that we should be looking beyond the initial contract or the endorsement itself, we believe the law is quite clear on cross motions for summary judgment. Both parties can see there's no issues of material fact to be decided, and that's what the trial court made clear in this case. Depping the situation here, we have really three arguments being made for no coverage. Two apply to the auto policy. One applies to the umbrella policy. On the umbrella policy, the only way coverage is avoided is if Matthew was not a resident of the household, and I'll address that issue last. On the auto policy, there are two arguments made. One is the purchase of other insurance avoids coverage. The second, the argument that was primarily addressed by counsel, the exclusion endorsement, which I'll spend the most time on here. I think there's a lot of facts concerning that, but I do just want to briefly say on the issue of Matthew Peterson's purchase of other insurance, he did buy a policy from State Farm, but he's not the named insured or the spouse of the named insured, and in order for Matthew's purchase of insurance to end economy mass coverage, he would have to have been the named insured or the spouse of the named insured under the policy language. Chris Parr, the underwriter representative from the company, agreed with me that Matthew Peterson was not the named insured or received the spouse of the named insured, and for that reason, his purchase of other insurance shouldn't apply here. So we're left on the auto policy with one main issue, and that's the exclusion endorsement. In Illinois, the general principles of contract law apply to policies like this, and most often we look for the intent of the parties, the mutual intent of the parties, and specifically, when we're talking about a policy that we're attempting to rescind or cancel, if that is going to take effect, there must be mutual consent to end or terminate the coverage that is stated by the Copley v. Pekin decision in the Illinois Supreme Court. So you have to have consent of both parties if you're trying to end coverage earlier than it would have otherwise. In this case, we have to look then at what the parties intended. Richard Peterson was clear. He wanted the coverage for Matthew to continue to the end of the policy period. He said that in his deposition. As to the intent of economy met... Didn't he also testify that the reason he went out and got the state farm policy was because he knew he was going to be required to sign an endorsement? Yes. What he testified to was he knew that before he could get renewal of his policy on March 15, he had to show his insurer that Matthew was not going to be living in the house and had his own insurance so that he could be excluded. He knew he had to do all that, and you have to understand, Mr. Peterson, if you read his deposition testimony, he was a very particular guy. He was a banker, and he did everything in a timely way, and he wanted to make sure all this was ready to go so that when the 15th came around, it would meet all the requirements. Regarding your argument about intent, what do we look to for intent? Shouldn't we just be looking at initially the policy itself and the language of the exclusion, which says, quote, this applies to your current policy and will apply to any subsequent renewal, which by its own terms means it applies to the current policy and it's signed that day? Well, first of all... Let me add on to that. Can we only look to intent when the policy language is ambiguous? No, and here's why. It's kind of a refined argument, but counsel cited to Dungy v. Haynes Britain, a Supreme Court decision from 1993, and Dungy states that general principle, which is you only really look beyond the policy if it's ambiguous, but then they go on to say something very, I think, important for this case. They say in determining whether an ambiguity exists in an insurance contract, this court's opinions have held that the court should consider four different things, and the second thing is the facts surrounding its execution. So, at the first instance, when this court has to determine is the exclusion endorsement ambiguous, they have to look at four different things, including, second factor, the facts surrounding the execution. Now, in that instance, if we're looking at this exclusion endorsement, obviously the facts surrounding its execution include what Janet Licht intended and what Richard Peterson intended. I do believe that if you look closely at this evidence, Janet Licht was quite clearly acting as the agent of the economy map, either as the agent in fact or the apparent agent. She signed as their authorized representative on the exclusion endorsement. Chris Parr said we wrote to Richard Peterson to tell him he could contact Williams Manning if they had questions about coverage. Chris Parr and her deposition went so far as to answer my question as to could Williams Manning and Janet Licht talk about when the coverage would terminate. She answered yes. Chris Parr said that Williams Manning and their agents could discuss termination of coverage and the periods of time when coverage would apply on behalf of the economy map. So, if we take Dungy at its word, and we look at the second factor, the facts surrounding the execution of the exclusion endorsement are very clear. On February 11th, before Matthew Peterson ever purchased the state farm insurance, Mr. Peterson and Janet Licht sat down and wrote this little handwritten memo which says March 15th all these changes would take place. Of course they wanted it to be March 15th because that was the end of the policy period. Nothing changed between that time and the end of the policy period. In fact, the same day that Mr. Peterson and Janet Licht signed that handwritten memo, February 11th, March 15th being the date that the coverage would end, that was the day Janet Licht handed them the exclusion endorsement. So, quite clearly when she handed them that exclusion endorsement, it was the same time they executed that memo saying all these changes will take place on March 15th. She corroborated that in her deposition and in her statement. They should be bound by her testimony and her actions with this insured individual, Mr. Peterson. Under the Burgos case, which we cited too, the Supreme Court held that when a broker is held out as the representative of the insurance company, then the insurance company will be bound by that broker's actions. Burgos, like here, had a form for the representative's name to be inserted. In Burgos, the broker's name went into the signature line. In our case, Janet Licht's name went into authorized representative on the economy in that form. That's how I understand your argument. You're taking the position that irrespective of the ambiguity, you must or you can look at the circumstances surrounding the signing of the document. Exactly. In every case. Well, I'm just simply reading to you what the Supreme Court said in the Dungy case, which is cited by the appellant here. This is your argument. Yes, Your Honor. I agree with Dungy. You should look at the facts surrounding the creation of the exclusion endorsement. It can't be looked at in a vacuum. I thought you said that was to determine whether or not there was an ambiguity. Yes. That's different than just the question Justice Bowman was asking you. Perhaps. On a philosophical level, I guess you're right. But you will come to the same conclusion once you look at the facts surrounding the creation of this document. I believe there's only one conclusion you can come to. It's an ambiguous document. Because the facts surrounding the creation indicate that both parties intended, mutually intended, this exclusion to apply on the 15th. If that document doesn't incorporate that term, then it's a mutual mistake. It should have. There was mutual consent here between the parties to end it on March 15th. If the document they signed doesn't include that term, then mutuality again should apply. In a mutual mistake in a contract, you should go back and apply the original intent of the parties. That's our law here, and I believe it should be followed. The facts surrounding the execution are clear. March 15th was the date intended by Janet Lick and by Mr. Peterson. Wasn't the trial court making a factual determination? I mean, was there a material dispute of fact? I don't think so. There is not. Either from Janet Lick's perspective or Richard Peterson's perspective, there's no disagreement. They both agreed March 15th was the effective date. So I don't think there was a factual dispute. And if you want to take a step beyond that, the person next closest to this transaction was Chris Parr. She's the Economy Met underwriter. She never interacted with Mr. Peterson, by the way. All the interactions was through the broker. But didn't Mr. Peterson, even in his depositions, wasn't he kind of all over the board on when was it going to be effective? And his reasons for getting it were he had to remove Matthew from the policy so he could get the renewal on March 15th. Why not just go in on March 15th when you're renewing the policy? Well, some of that goes back to his personality. He was a banker. He was very adamant about wanting to make sure everything was lined up right. But being a banker and wanting to make sure everything was clear, he did sit there with Janet Lick and create that handwritten memo that said March 15th. I don't think he was all over the place, Justice Burkett. I believe from day one he and Janet Lick always intended March 15th. I think if you look closely at his statement and his deposition, it's clear that's what he wanted. Now, Chris Parr, who never interacted with Mr. Peterson, created two entries, one handwritten, one computer, regarding this transaction. Chris Parr is their underwriter. Old times, she said, effective March 15th at Matthew has excluded driver. Now, they've raised this issue that that was to correct the broker's designation of him as deleted. They wanted to make sure it was excluded, not deleted. If we accept that at face value, you still have to ask the question, why didn't she say, add him as excluded, effective February 27th? They still put in both in the handwritten note and the computer entry, March 15th. So there's no entry anywhere in the record where it says, this is the date you drop it, February 27th. They could have put that exact language in the exclusion endorsement. They did not. So although it says that the exclusion endorsement applies to current policies, it doesn't say when. It just says it applies to current policies. I believe to determine when it applies to the current policy, you have to look at the facts surrounding the creation of the document. So all those things together, and finally, I forgot to mention this, the accounting entries. There's only one accounting entry deleting Matthew for coverage, and that was March 15th. So I don't see any dates anywhere in the computer entry saying February 27th is the date we're dropping him from coverage. The first time that was raised was after the underlying lawsuit was filed in the personal injury lawsuit. That's the first time there was an attempt to interpret the exclusion as applying on February 27th. That's when this declaratory action was filed, after the underlying lawsuit was filed. I do want to address, for all those reasons, I believe the exclusion endorsement should be given its intended effect, which is March 15th. That's what both parties intended when they first created it. I do want to address the umbrella policy just briefly here. As I said, there's only one argument being made on the umbrella policy, and that is, was Matthew a resident of his grandfather's household? Illinois case law says you can have more than one residence for purposes of insurance contracts. And in Matthew's case, I actually think he really only had one residence. Although he stayed with his girlfriend some of the time, all his mail was received at his grandfather's. He kept his clothes there. He and his grandfather called it his home base. Because his parents had split, he didn't feel comfortable living with either of them anymore. He only felt comfortable with his grandfather. That was what he considered his home base. He said, this is Matthew in his testimony, that he was there 70% of the time in the six months leading up to this. Richard Peterson said that his grandson was there 50% of the time. This case is just like the Murphy case that we cited. In Murphy, a father and son lived together at the time the policy was purchased. After the purchase of the policy, the father remarries and goes to live most of the time with his new wife. The court was looking at a provision that said coverage only applies if you are living with the named insured. In our case, it says you must be a resident in the household of the named insured. Can you have umbrella policy without an underlying policy, a regular? Yes. In this case, actually, the policy provides for that. It does provide for that. The named insured is responsible for obtaining other insurance through other carriers if there's no underlying insurance through economy met. And they're responsible for any gap, basically what they say. So yes, in answer to your question, you can under this policy. On this issue, though, of residents in the Murphy case, what they said is the term living with the insured was ambiguous because they don't say when you have to be living with the insured. Is it when the policy is purchased? Is it at the time of the accident or the date of claim? In our case, we have the phrase residing in the household of. And again, there's no clarification of. Is that a purchase of the insurance? Is that at the time of the accident? In today's world, you have many spouses who travel quite a bit overseas. Do you have to establish that you're living there at the time of an accident for the coverage to apply? No, I think you have to give it its common sense definition, which is, is this one of the places that you consider a residence? In Matthew's case, it clearly was. That's why I believe the umbrella policy should apply. And I believe that the court was correct in finding that. Thank you. Any questions?  Can we model our agreement, please? Thank you, Your Honor. With respect to the metropolitan policy, the term insured is defined in that policy as you or a relative residing in your household. Using the present tense, the Carrasco v. Hutchcraft case says the term resident, which is what the policy uses, is not ambiguous. It means intent in permanency of abode in addition to their physical presence. So let's not confuse the fact that Matthew had at times stayed with his grandfather. His grandfather said, and Janet White said, that Matthew was not a resident of his household in January, in February, and in March. When was he not a resident of the household? At the time of the occurrence, Your Honor. And what specific date did he move out? We know. Well, in fact, you know, our opponents place a lot of value in this note written by Janet White on February 11, 2008. At that time, both she and Richard say he wasn't living in the household, and that note says that, that he's no longer living in the household. But in the record and in our brief, we also point to an earlier email from Janet White to Chris Parr that says in January that he had already moved out of Richard's household. Isn't that a fact question, because you have testimony from Richard that he spent, that Matthew spent 70% of his time living in the house, and testimony from Matthew that he spent 50% of his time living in the house. Well, Richard, I'm sorry, Your Honor, I didn't mean to interrupt. How do you avoid getting into a factual question regarding whether he was or was not a resident on the date of the accident, 27th? Well, you look to what Richard said. And what Janet said, both of them agreed that he was not in the household, and their testimony was unequivocal. Matthew also said that right after the accident. Why did State Farm then mail his new policy to him at Richard's home on February 20th, if he was no longer residing with Richard? Because they gave Richard's address as a mailing address. And Richard went into State Farm on February 15th, got the policy effective February 22nd, and gave his mailing address. As we can understand, Richard wanted to make sure that he had coverage, and so he had, was using his address as a mailing address. We urge this court not to accept this invitation to look at one section of Janet White's recorded statement and compare it with her deposition testimony. Repeatedly, our opponents have taken snippets here and snippets there and said, we can look at these snippets, which I can assure you are contradicted by other snippets, and we can determine unequivocally that everybody intended that this document that states it applies to your current policy, and that the signatures on it demonstrate assent to that change in the policy, that this document doesn't mean what it says. Janet White's note that our opponents rely on so heavily didn't say what they tell you it says. It said, effective 3-15-08, remove the Chevy Malibu and remove the Cadillac. It doesn't say, effective 3-15-08, remove Matthew. It simply says, remove Matthew Peterson as a driver no longer in the household as of February 11, 2008. Moreover, the same Janet White, upon whom our opponents place so much reliance, said so clearly at her deposition, it's the economy who makes the decisions about when the endorsement goes into effect, not her. Your time is up, so you can finish that one thought. I will. My one thought that I want to finish with is this court doesn't need to get into this he said, she said dispute, because the language of the endorsement itself is clear and precludes coverage for the accident in question in this case. Thank you. Thank you. Your case is taken on your advice, and the court stands adjourned at this time.